UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


EUGENE SHOPE,
PLAINTIFF

VS.

COMMISSIONER OF
SOCIAL SECURITY,
DEFENDANT

CASE NO. 1:08CV00095
(DLOTT, J).
(HOGAN, M.J.)


## REPORT AND RECOMMENDATION

Plaintiff filed his application for disability insurance benefits in March, 2000. He alleged an onset date of September 16, 2003. Plaintiff's application was denied both initially and upon reconsideration. Plaintiff then requested and obtained a hearing before an Administrative Law Judge (ALJ) in Portsmouth, Ohio in May, 2006. Plaintiff, who was represented by counsel, testified at the hearing as did Vocational Expert (VE), Robert Breslin. The ALJ reached an unfavorable decision in June, 2006 and Plaintiff then processed an Appeal to the Appeals Council, which denied review in December, 2007. Plaintiff then timely filed his Complaint with this Court in January, 2008.

## STATEMENTS OF ERROR

Plaintiff asserts that the ALJ made three errors prejudicial to his case. The first, when broken down, essentially states two errors, the first of which is that the ALJ's residual functional capacity assessment and therefore his hypothetical question to the VE did not fairly describe Plaintiff, and the second is that substantial evidence did not support the ALJ's decision. The second also contains two alleged errors, the first of which is that the ALJ gave insufficient weight to the opinions of treating physicians, and the second is that the ALJ erred by not obtaining the

services of a independent medical expert. The last Statement of Error faults the ALJ for misevaluating Plaintiff's testimony and subjective complaints of pain.

## PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff testified that he lived with his wife in Ironton, Ohio and that he was a high school graduate. Plaintiff stated he was 5'5" tall, weighed 165 lbs. and was right-handed. Plaintiff stated that his last job was at Lowe's as a home improvement laborer. He worked in the lumber yard and drove a fork lift and loader, stocked shelves and waited on customers. Plaintiff testified that he left Lowe's on September 16, 2003 because of rhumatoid arthritis. Prior employment was as a crew leader building vinyl windows. Plaintiff stated that he could not perform full-time work because of his arthritis, a condition he has had since 1995. He stated he has been treating with Dr. Samuel ever since. Plaintiff identified his hands, wrists, elbows and knees as the most affected joints and stated that his left side is worse than his right. Plaintiff testified that his condition causes good days and bad days, but on a good day his pain level is a 7 on a 10-point scale and on a bad day, his pain level is a 9.

Plaintiff testified that he formerly took Remicade and noticed little difference when he didn't. The successor medication was Humira, which "helps some." Currently, he takes Methotrexate, which "helps me some, " folic acid and Roxicodone for pain. Plaintiff identified Dr. Fisher as his "pain clinic doctor," who he has been seeing for the past two years. Plaintiff testified that his pain was constant and that he does not experience side-effects from his medication. He naps twice per day for an hour. He is able to mow the grass with a riding mower, but in 15-30 minute sessions, do laundry, cook, load the dishwasher, shop and drive. He has given up fishing, hunting and softball, but camps once per year.

Plaintiff estimated that he could sit for 1/2 hour at a time, walk about 2 blocks and stand for 45 minutes at a time. He stated he suffers from trigger fingers in both hands, but that the left hand is worse than the right. Sleep is interrupted by aching hips. He uses a cane, prescribed by Dr. Samuel most of the time. (Tr. 252-280).

## THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The ALJ's first hypothetical question to the VE asked him to assume that Plaintiff could lift 50 lbs. occasionally and 25 lbs. frequently, occasionally climb ramps and stairs, but never ladders, ropes or scaffolds. Plaintiff could occasionally balance, stoop, kneel, crouch and crawl. Plaintiff could frequently handle and finger. The VE responded that Plaintiff could perform his past relevant work as a window assembler, but as described in the Dictionary of Occupational Titles, not as Plaintiff performed the job. The VE responded that Plaintiff could also perform the job of production inspector, a light and unskilled job, as well as the medium and unskilled jobs of hand packager and kitchen helper.

The ALJ's second hypothetical question to the VE asked him to assume the accuracy of Plaintiff's testimony. The VE responded that Plaintiff would be unemployable. (Tr. 280-282)

## THE MEDICAL RECORD

Plaintiff saw Mathew Samuel, M.D., a rheumatologist, in January, 2006 with a complaint of triggering in his left fourth finger. There was pain, but no swelling. Dr. Samuel found Plaintiff's rheumatoid arthritis to be "clinically stable." A steroidal injection was attempted, but it was too painful. (Tr. 47). On November 26, 2005, Dr. Samuel also reported that Plaintiff's rheumatoid arthritis was "clinically stable," that there was no synovitis and that Plaintiff's fist and grip were good. (Tr. 48).

Plaintiff was seen in November, 2005 by Philip Fisher, an osteopath who also holds a Ph.D. The patient reported that his medications were "working pretty well." Dr. Fisher described Plaintiff's condition as exhibiting an "ITB Syndrome, caused by either an altered gait pattern where the person wobbles or by trochanteric hip bursitis." Dr. Fisher felt that the condition typically responds well to physical therapy combined with corticosteroid therapy. Stretching exercises were demonstrated. (Tr. 50).

In March, 2006, Dr. Samuel reported that Plaintiff complained of joint pain, but there was no synovitis, loss of motion or effusion. His rheumatoid arthritis was "stable." (Tr. 51). In

3

February, 2004, an MRA of the head was done at our Lady of Bellefonte Hospital in Ashland, Kentucky. The results showed "no vascular malformation, aneurism or abnormal vasculature." (Tr. 134). An MRI of the head, taken on the same date, showed possible "hypertension and small vessel disease." (Tr. 135). A carotid doppler study was done in May, 2004 and the results were normal. (Tr. 137). A lumbar puncture or spinal tap was done in May, 2004. (Tr. 138)

A Physical Residual Functional Capacity Assessment was done in May, 2004 by Jerry McCloud, M.D., an orthopaedic surgeon. Dr. McCloud opined that Plaintiff could lift 50 lbs. occasionally and 25 lbs. frequently. He could stand/walk for 6 hours in a workday and sit for the same length of time. Dr. McCloud's rationale was that Plaintiff had rheumatoid arthritis, subject to occasional flareups and high blood pressure, which was controlled. His neurological examination and range of motion were normal. He displayed some tenderness in the upper extremity joints, but had no skin rash or synovitis. Dr. McCloud felt that Plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl, but should never climb ropes, ladders or scaffolds. He found no manipulative limitations. Anton Friehofner, M.D., agreed. (Tr. 139-144)

An x-ray of the cervical spine in December, 1995 was normal. (Tr. 149).

Plaintiff saw Dr. Samuel in December, 1995 with multiple complaints of pain in the right hand, wrist and shoulder, left wrist, groin and foot as well as finger swelling. The history indicated that Plaintiff's right shoulder was injected on two occasions and that an MRI of his neck was normal. Prior surgeries were for a torn ligament in his right knee and right hand carpel tunnel release. Dr. Samuel indicated that Plaintiff had symptoms suggestive of Fibromyalgia, Bicipital tendonitis and Arthritis. Dr. Samuel injected Plaintiff's right shoulder, discontinued Flexeril and prescribed Elavil and Ultram. He continued Relafen. (Tr. 151-152). In January, 1996, Dr. Samuel reported that Plaintiff was "symptomatically better." Relafen was discontinued. There was no evidence of synovitis. (Tr. 153). In February, 1996, Dr. Samuel reported that Plaintiff was "clinically stable." Fibromyalgia was the primary diagnosis. (Tr. 154). In February, 1999, Dr. Samuel saw Plaintiff for severe pain in the right shoulder as well as a triggering sensation and swelling in his right hand. Dr. Samuel was leaning toward a diagnosis of rheumatoid arthritis, rather than fibromyalgia. Prednisone was prescribed. (Tr. 155-156).

4

In February, 1999, Dr. Samuel reported that Plaintiff had "prolonged morning stiffness as well as pain and swelling of his hands" Fist and grip were incomplete. There was trigger fingering. The diagnosis of rheumatoid arthritis was confirmed. Plaintiff was started on Methotrexate. (Tr. 157). In February, 1999, Plaintiff's right shoulder was injected by Dr. Samuel. (Tr. 158). In March, 1999, Plaintiff reported that the shoulder injection helped. (Tr. 159). In April, 1999, Dr. Samuel reported that Plaintiff's rheumatoid arthritis was "stable," an observation he also made in May, July and August, 1999. (Tr. 160-163). In September, 1999, Dr. Samuel noted that Plaintiff had no joint pain nor swelling. There was no synovitis, loss of motion or effusion. (Tr. 164). In November, 1999, Plaintiff complained of numbness, tingling and pain in his left hand, symptoms which led Dr. Samuel to conclude that Plaintiff had carpel tunnel syndrome. There was no joint pain, nor swelling. (Tr. 165-166).

Plaintiff's visited Dr. Samuel after carpel tunnel surgery. There was minimal hand pain and "mild activity" with regard to Plaintiff's rheumatoid arthritis. (Tr. 167). In March, 2000, Dr. Samuel reported that Plaintiff's rheumatoid arthritis was "stable." (Tr., Pg 168). In April, Plaintiff complained of hand pain after work. There was "minimal activity relative to Plaintiff's rheumatoid arthritis," an observation Dr. Samuel repeated in May, 2000. (Tr. 169-170). In June, 2000, Dr. Samuel reported that Plaintiff had prolonged morning stiffness as well as pain and swelling of his hands. He regarded these symptoms as showing "mild to moderate activity" of Plaintiff's rheumatoid arthritis. (Tr. 171). Also in June, 2000, Dr. Samuel said that Plaintiff had pain and swelling in his hands, tenderness in both shoulders and an incomplete fist and grip with both hands, but in July, 2000, Dr. Samuel indicated that Plaintiff's fist and grip were "good," but Plaintiff still complained of morning stiffness. (Tr. 172-173).

Plaintiff's rheumatoid arthritis was "stable" in August, October, November and December, 2000. (Tr. 174-177). In March, 2001, Dr. Samuel reported that Plaintiff was currently taking Methotrexate, folic acid, Celebrex and Percoset for pain. His rheumatoid arthritis was "stable," an observation he repeated in April and in June, 2001. (Tr. 178-180). In September, 2001, Dr. Samuel said that Plaintiff had tenderness and loss of motion in the shoulders and wrists. His fist and grip were "incomplete." (Tr. 181). In October, 2001, however Plaintiff's rheumatoid arthritis was "stable" and his fist and grip were good. (Tr. 182). In December, 2001,

5

however, Plaintiff's fist and grip were incomplete, there was wrist tenderness and "prominence of the right ulnar styloid process and in January, 2002, the report was much the same, except that Plaintiff's fist and grip were good. (Tr. 183-184).

In February, 2002, there was minimal tenderness of the right wrist and Plaintiff's fist and grip were good, and in March, 2002, there was no active synovitis, loss of motion or effusion in the upper extremities. (Tr. 185-186). In April, 2002, Plaintiff's fist and grip were good. (Tr. 187). In May and July, 2002, Plaintiff denied any joint pain. (Tr. 188-189). In August, 2001, Plaintiff reported hand pain, but no swelling. (Tr. 190). In October, 2002, there was no joint pain, but in November, 2002, there was joint pain, but no swelling. (Tr. 191-192). There was no joint pain in January, 2003, but in February and March, 2002, the report was of hand pain, but no swelling. (Tr. 193-195). In May, 2003, Plaintiff reported "minimal tenderness" and no swelling. (Tr.196). In June, 2003, Plaintiff reported pain in multiple joints, but no swelling. Fist and grip were good. (Tr. 197). In August, 2003, Plaintiff had what Dr. Samuel described as an "RA flareup," tenderness of multiple joints and swelling of the right wrist. His symptoms were about the same in July, 2003. (Tr. 198-199).

In September, 2003, Plaintiff's hand became increasingly painful and he continued to have prolonged morning stiffness. Pain medication had to be increased. Dr. Samuel reported that "Patient is not able to perform his work as a worker at Lowe's Home Improvement Store." Dr. Samuel excused Plaintiff from work for one month. (Tr. 200). In October, 2003, Dr. Samuel reported that "Plaintiff is not able to work." (Tr. 201). Dr. Samuel's progress notes from visits in November and December, 2003 and January, February and March, 2004 all show either mild or mild to moderate activity relative to Plaintiff's rheumatoid arthritis. (Tr. 202-206). In March, 2004, Dr. Samuel reported that Plaintiff has rheumatoid arthritis, is on multiple chemotherapeutic medications including MTX, Arave and IV Remicade. Dr. Samuel also said that Plaintiff was still symptomatic and "not able to perform his job as an employee at Lowe's."
Dr. Samuel concluded with his opinion that "the patient is totally and permanently disabled from his severe Rheumatoid Arthritis." (Tr. 207).

The possibility of Plaintiff having multiple sclerosis was investigated by Dr. Bansai. In April, 2004, after Remicade was stopped, Plaintiff's symptoms worsened. He had pain and

6

swelling in multiple joints and was not able to ambulate. (Tr. 210). His severe flare-up continued into May, 2004. A spinal tap was planned to rule out or confirm multiple sclerosis. (Tr. 211). In June, 2004, his symptoms lessened and it was determined to return to Remicade if the Cleveland Clinic so authorized. (Tr. 212). In July, 2004, Dr. Samuel received confirmation that multiple sclerosis was ruled out and Remicade was restarted. (Tr. 213). In August, 2004, Plaintiff still reported swelling of his hands and prolonged morning stiffness. (Tr. 214).

In August, 2004, I believe, Dr. Samuel reported that Plaintiff has rheumatoid arthritis, a history of joint pain, swelling and tenderness, an inability to ambulate effectively and an inability to perform fine and gross movements effectively. (Tr. 217).

In February, 2004, Bal Bansai, M.D. did a neurological work-up on Plaintiff and reported to Dr. Samuel that "Patient's neurological examination shows mental status, cranial nerves, muscle tone, muscle strength, reflexes, coordination, gait, station and tandem walk are basically unremarkable other than limitation of abduction of the left arm." Dr. Bansai prescribed Topomax for Plaintiff's headaches. He also said that Plaintiff's MRI scan did not rule out multiple sclerosis, but that the sole symptom, numbness and tingling in his hands, was likely due to carpel tunnel syndrome. (Tr. 219-223).

Dr. Samuels' progress notes from January, February, March and May, 2005 show that Plaintiff's rheumatoid arthritis was stable. (Tr. 227-230).

Dr. Bansai referred Plaintiff to the Cleveland Clinic for a second opinion regarding Plaintiff's possible multiple sclerosis. The evidence pointing in the direction of a multiple sclerosis diagnosis was small spots or lesions on a brain MRI. The multiple sclerosis evaluation was negative and the spots were "related to his life-long history of headaches. The Clinic, per Robert Fox, M.D. recommended that Remicade be restarted and that Neurontin be used for pain management. (Tr. 235-242).

Lastly, in July, 2004, Dr. Bansai reported that Plaintiff has a history of joint pain, swelling and tenderness, an inability to perform fine and gross movements effectively and has inflammatory arthritis with signs of peripheral joint inflammation. (Tr. 244).

## OPINION

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for disability insurance benefits, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(i), 423. Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal

those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321 (6th Cir. 1978); *Phillips v. Harris*, 488 F. Supp. 1161 (W.D. Va. 1980). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *see Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

When the grid is not applicable, the Commissioner must make more than a generalized finding that work is available in the national economy; there must be "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform *specific* jobs." *Richardson v. Secretary of H.H.S.*, 735 F.2d 962, 964 (6th Cir. 1984) (per curiam) (emphasis in original); *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). Taking notice of job availability and requirements is disfavored. *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 536-37 n.7, 540 n.9 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). There must be more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *Richardson*, 735 F.2d at 964; *Kirk*, 667 F.2d at 536-37 n.7. The Commissioner is not

permitted to equate the existence of certain work with plaintiff's capacity for such work on the basis of the Commissioner's own opinion. This crucial gap is bridged only through specific proof of plaintiff's individual capacity, as well as proof of the requirements of the relevant jobs. *Phillips v. Harris*, 488 F. Supp. 1161 (W.D. Va. 1980)(citing *Taylor v. Weinberger*, 512 F.2d 664 (4th Cir. 1975)). When the grid is inapplicable, the testimony of a vocational expert is required to show the availability of jobs that plaintiff can perform. *Born v. Secretary of H.H.S.*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Varley v. Secretary of H.H.S.*, 820 F.2d 777, 779 (6th Cir. 1987).

The assumptions contained in an ALJ's hypothetical question to a vocational expert must be supported by some evidence in the record. *Hardaway v. Secretary of H.H.S.*, 823 F.2d 922, 927-28 (6th Cir. 1987). A proper hypothetical question should accurately describe plaintiff "in all significant, relevant respects; for a response to a hypothetical question to constitute substantial evidence, each element of the hypothetical must accurately describe the claimant." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). *See also Varley v. Secretary of H.H.S.*, 820 F.2d 777, 779 (6th Cir. 1987). Where the evidence supports plaintiff's allegations of pain, a response to a hypothetical question that omits any consideration of plaintiff's pain and its effects is of "little if any evidentiary value." *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975). However, "the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Secretary of H.H.S.*, 39 F.3d 115, 118 (6th Cir. 1994).

Pain alone, if the result of a medical impairment, may be severe enough to constitute disability. *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). In order to find plaintiff disabled on the basis of pain alone, the Commissioner must first determine whether there is objective medical evidence of an underlying medical condition. If there is, the Commissioner must then determine: (1) whether the objective medical evidence confirms the severity of pain alleged by plaintiff; or (2) whether the underlying medical impairment is severe enough that it can reasonably be expected to produce the allegedly disabling pain. *Duncan v. Secretary of H.H.S.*, 801 F.2d 847, 852-53 (6th Cir. 1986). *See also Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994); *Jones v. Secretary of H.H.S.*, 945 F.2d 1365, 1369 (6th Cir. 1991). This test, however, "does not require . . . 'objective evidence of the pain

itself.'" *Duncan*, 801 F.2d at 853. Where a complaint of pain is not fully supported by objective medical findings, the Commissioner should consider the frequency and duration of pain, as well as other precipitating factors including the effect of the pain upon plaintiff's activities, the effect of plaintiff's medications and other treatments for pain, and the recorded observations of pain by plaintiff's physicians. *Felisky*, 35 F.3d at 1039-40.

Where the medical evidence is consistent, and supports plaintiff's complaints of the existence and severity of pain, the ALJ may not discredit plaintiff's testimony and deny benefits. *King v. Heckler*, 742 F.2d 968, 975 (6th Cir. 1984). Where, however, the medical evidence conflicts, and there is substantial evidence supporting and opposing a finding of disability, the Commissioner's resolution of the conflict will not be disturbed by the Court. *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983) (per curiam). In either event, the ALJ must articulate, on the record, his evaluation of the evidence and how it relates to the factors listed above. *Felisky*, 35 F.3d at 1039-41.

In light of the Commissioner's opportunity to observe the individual's demeanor, the Commissioner's credibility finding is entitled to deference and should not be discarded lightly. *Kirk*, 667 F.2d at 538. "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky*, 35 F.3d at 1036. The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst v. Sec. of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985)(citing *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984)).

A treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048, 1054 (6th Cir. 1983). A summary by an attending physician made over a period of time need not be accompanied by a description of the specific tests in order to be regarded as credible and substantial. *Cornett v. Califano*, No. C-1-78-433 (S.D. Ohio Feb. 7, 1979) (LEXIS, Genfed library, Dist. file). A physician's statement that plaintiff is disabled is not determinative of the ultimate issue. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984). The weight given a treating physician's opinion on the nature and severity of impairments depends on whether it is supported

by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. § 404.1527(d); *Harris v. Heckler*, 756 F.2d 431 (6th Cir. 1985). If not contradicted by any substantial evidence, a treating physician's medical opinions and diagnoses are afforded complete deference. *Harris*, 756 F.2d at 435. *See also Cohen v. Secretary of H.H.S.*, 964 F.2d 524, 528 (6th Cir. 1992). While the Commissioner may have expertise in some matters, this expertise cannot supplant the medical expert. *Hall v. Celebrezze,* 314 F.2d 686, 690 (6th Cir. 1963); *Lachey v. Secretary of H.H.S.,* 508 F. Supp. 726, 730 (S.D. Ohio 1981).

It is the Commissioner's function to resolve conflicts in the medical evidence and to determine issues of credibility. *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994); *Hardaway v. Secretary of H.H.S.*, 823 F.2d 922, 928 (6th Cir. 1987); *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). The Commissioner's determination must stand if it is supported by substantial evidence regardless of whether the reviewing court would resolve the conflicts in the evidence differently. *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). *See also Boyle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *Tyra v. Secretary of H.H.S.*, 896 F.2d 1024, 1028 (6th Cir. 1990). The Commissioner must state not only the evidence considered which supports the conclusion but must also give some indication of the evidence rejected in order to facilitate meaningful judicial review. *Hurst v. Secretary of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985). *See also Shelman v. Heckle*r, 821 F.2d 316, 321 (6th Cir. 1987).

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 111 S. Ct. 2157, 2163 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043 (6th Cir. Jan. 2, 1990) (unpublished, available on Westlaw). Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v.*

*Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher*, 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher*, 17 F.3d at 176. *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).

Deciding Plaintiff's three Statements of Error in somewhat reverse order would make the most sense. Plaintiff's third Statement of Error is that the ALJ misevaluated Plaintiff's testimony and subjective complaints of pain. The ALJ found Plaintiff to be "partially, but not fully credible." The ALJ made specific reference to Plaintiff's "good work record" as enhancing his credibility, but the main factor detracting from his credibility was his assertion that his rheumatoid arthritis has not significantly improved since the onset date in September, 2003. The ALJ also made reference to Plaintiff's reported activities of daily living, such as loading the dishwasher, driving an automobile, doing laundry and shopping.

Plaintiff testified that his pain was relatively constant and at a high level, but he conceded that he had both good and bad days. The ALJ felt that Plaintiff's subjective reports of pain were inconsistent with Dr. Samuel's progress notes. We disagree that substantial evidence supports such a finding. On September, 16, 2003, Dr. Samuel reported that "the patient had to increase the pain medication due to increased pain and swelling." On October, 14th, Dr. Samuel's progress notes showed that Plaintiff had pain and swelling in his hands and considered his rhumatoid arthritis to be severe. On November 5th and December 12th, Dr. Samuel said that Plaintiff still had painful and swollen hands. On January 7, 2004, Dr. Samuel reported that Plaintiff's hands were painful and stiff. On February 2nd, Dr. Samuel noted that "Patient has

13

prolonged morning stiffness, pain of the joints with minimal swelling." On March 3rd, the progress note said "Patient still has pain in multiple joints . . . and is not able to work" and Dr. Samuel's letter said that "Plaintiff is totally and permanently disabled due to severe Rhumatoid Arthritis." In April, 2004, the report was that Plaintiff "still has pain and swelling of the hand joints" and on April 28, 2008, there was another flare-up, leading Dr. Samuel to conclude that "Plaintiff is not able to ambulate and still has pain and swelling of multiple joints." Plaintiff's flare-up on May 18, 2004 was described by Dr. Samuel as severe. He reported that Plaintiff "is having pain in multiple joints." On June 18th, the concern was that Plaintiff might have multiple sclerosis and he was referred to the Cleveland Clinic. On July 28th, Plaintiff was considering the Pain Clinic. Dr. Samuel's progress note of August 8th was that "patient is complaining about pain and swelling of the hand joints with prolonged morning stiffness."

It is true that for many of these progress notes, Dr. Samuel reported that there was mild or minimal activity or that Plaintiff's condition was stable or clinically stable. The ALJ apparently interpreted these comments within the body of the progress notes to indicate that Plaintiff's condition was improving. We have grave doubts that the ALJ's interpretation was in line with what Dr. Samuel intended. These comments more likely were meant to gauge the effectiveness of the various medications that Dr. Samuel was trying and to establish a base line for Plaintiff's symptomotology.

In any event, we don't find anything in Plaintiff's testimony or in his medical record to question Plaintiff's honesty. Whether or not his testimony about what he thinks he is able to do corresponds with what physicians believe he is able to do may impact the accuracy of Plaintiff's testimony and the ALJ obviously put his faith in the report of the paper reviewers, Drs. McCloud and Friehofner, thus bringing the accuracy of Plaintiff's testimony into play. The ALJ obviously considered Plaintiff's credibility in that sense and although we disagree with his assessment, that fact does not lead to the conclusion that Plaintiff is or is not disabled. Sustaining or overruling this Statement of Error gets the Plaintiff nowhere.

The First Statement of Errors is that substantial evidence did not support the ALJ's decision that Plaintiff was able to work. Ultimately, this comes down to a consideration of expert opinions, those of Drs. McCloud and Friehofner, paper reviewers, but trained in

14

orthopaedics, which encompasses injuries to bones, muscles and joints, and the opposing view expressed by Dr. Samuel, a treating physician with considerable longitudinal experience with Plaintiff and a specialist in rheumatology. Drs. McCloud and Friehofner provided residual functional capacity assessments in May, 2004, indicating that Plaintiff had the residual functional capacity to perform medium work. In March, 2004, Dr. Samuel found Plaintiff unable to continue at Lowe's and totally and permanently disabled, but apparently declined to provide a residual functional capacity assessment, probably because he is a rheumatologist, not a specialist in physical medicine. Had Dr. Samuel expressed knowledge that there are light, medium, heavy and sedentary jobs available in the workplace and that in his opinion, Plaintiff could not perform work at any exertional level on a consistent basis, we would agree that treating specialists trump paper reviewers and reverse this case for an award of benefits. But Dr. Samuel was silent on the subject.

The ALJ referred to Dr. Samuel's Rheumatoid Arthritis Medical Assessment Form, completed two days after seeing his patient, and Dr. Bansai's similar form as not entitled to "any weight." Dr. Bansai is a treating neurologist, who opined, as did Dr. Samuel, that Plaintiff was unable to perform fine and gross movements effectively. We believe declining to give any weight at all to treating physicians' opinions is almost always erroneous, and especially so in this case where a medical expert could and should have been called, primarily to determine whether Plaintiff, whose hands seem to be the most affected by his rheumatoid arthritis, has the ability to frequently handle and finger, when Plaintiff often suffers from pain and stiffness in his hands, experiences trigger fingers and has had carpel tunnel surgery.

Another concern relative to the ALJ's residual functional capacity assessment was his failure to make any accommodation for Plaintiff's gait and his use of a cane. Plaintiff testified that Dr. Samuel wrote him a prescription for a cane and that he uses it most of the time. Dr. Samuel noted that Plaintiff sustained a torn ligament in his right knee and it was repaired through arthroscopy. He also indicated on April 28, 2004 that Plaintiff was unable to ambulate. Forms filled out by both Dr. Samuel indicted that Plaintiff could not ambulate effectively, although Dr. Bansai disagreed. The Cleveland Clinic reports are inconclusive because at one point, Plaintiff's gait was listed as normal and at another, his gait was said to be abnormal. We do know,

however, that Plaintiff's hand weakness was described by Dr. Fox at the Clinic as being "progressive" and that Plaintiff listed his knees as among the joints most affected by his condition. Substantial evidence supports the conclusion that Plaintiff uses a cane for legitimate reasons and his need for same should have been one of the factors used to describe him to the VE.

Our discussion of Plaintiff's First Statement of Errors subsumes the second, that the ALJ gave insufficient weight to the opinion of treating physicians and should have called a medical expert. Without a medical expert, the status of the record gives one reason to question the opinions of paper reviewers, but not to the point where the Court can conclude that Plaintiff has proved disability status. This case should be remanded for a rheumatologist to review the medical record and voice an opinion on whether Plaintiff has the residual functional capacity to perform medium work and whether he has the residual functional capacity to frequently handle and finger, and for the VE to say whether the jobs identified can be performed by one who requires a cane most of the time. If the ALJ's RFC assessment and resulting hypothetical was erroneous, so may have been the VE's testimony, and since the ALJ relied upon the VE's testimony, the error was likely compounded. A medical expert's testimony should tip the balance and provide substantial evidence, one way or another.

For the reasons stated above, the Court finds that the ALJ's decision is not supported by substantial evidence and should be reversed.

In determining whether this matter should be reversed outright for an award of benefits or remanded for further proceedings, the Court notes that all essential factual issues have not been resolved in this matter, nor does the current record adequately establish Plaintiff's entitlement to benefits. *Faucher,* 17 F.3d at 176. This matter should be remanded for further proceedings, including the review and testimony of a rheumatologist, who can formulate an opinion on Plaintiff's ability to perform medium work and whether he has the residual functional capacity to frequently handle and finger perform the exertional requirements of medium work; and further vocational considerations consistent with this decision.

## IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner by **REVERSED** and **REMANDED** for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

March 9, 2009

_____
Timothy S. Hogan
United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO THIS R&R

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten (10) days after being served with this Report and Recommendation. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen (13) days (excluding intervening Saturdays, Sundays, and legal holidays) in the event this Report is served by mail, and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).